May it please the Court. I'm Joseph Daly for the Plaintiffs' Appellants Armando and Alinda Martinez. I'd like to reserve two of my 15 minutes for rebuttal. This morning, Your Honors, I'm going to focus on the main question presented by this appeal. Namely, whether it's proper to defer to HUD, the Department of Housing and Urban Development, their interpretation of RESPA Section 8b as preventing unilateral overcharges by a settlement provider because those charges comprise the sort of unearned fees that RESPA specifically and expressly outlaws. Now, the question here today turns on Chevron deference. And as the Court well knows, Chevron is a two-part test. The first step of Chevron is, has Congress directly spoken to the precise question at issue? Well, what is the precise question here? Whether or not these unilateral overcharges are beneath the penumbra of unearned fees that RESPA specifically outlaws? If so — Well, the other circuits have basically come down against you. But the most, I think, the closest ones are the second, third, and the eleventh. Right? That's true, Your Honor. But, you know, as this Court pointed out in the Schutz case, RESPA, this statute is a very complicated, complex statute. And when this — if this Court were to look at the other circuits, you can see that they're all over the place on certain things. Some of the circuits believe that RESPA all by itself, all three sections of it, is nothing more than an anti-kickback statute. That can't be true given the delineation of the subsections there. Some other circuits think that it's okay to — to outlaw overcharges, but those overcharges have to be split with another settlement provider. And one circuit, I believe it's the eleventh in the Sosa case, acknowledges that unilateral overcharges may be outlawed by RESPA. So I don't think this Court necessarily needs to look at what the other circuits are doing, particularly because, as I said — as I started off saying, this is a question of — of Chevron interpretation. And if we look at the — at the expressed language of the statute, Section 8b, it forbids, unequivocally, the receipt of any — the giving or the receipt of any portion, any split, any percentage of an unearned fee. And I think it's fair to say that charging $800 here for a $20 process is an unearned fee. Now, let's assume for the sake of argument that we agree that RESPA is ambiguous on this point. Well, you have to. It's got to be ambiguous for you to get to Step 2. And that's where — that's your strongest point. Agreed. I was going to say, though, at one point, if you wanted to, you could — we wouldn't even have to go to the second point. We could — we could say that RESPA is clear enough on the fact of unearned charges that we wouldn't even have to go there. But let's go there. Well, if it were so clear, why would HUD even have to do a — say something? Doesn't that — I mean, if I were sitting there as you, I would argue HUD wouldn't have had to say anything unless it was ambiguous, and therefore it is ambiguous, and then we should do what HUD says. Well, let's go to the second stage. And that is whether or not there's a Federal agency charged with interpreting and enforcing the statute, whether that agency has come up with an interpretation of the statute that is merely permissible. And in this case, HUD, most recently in 2001, came out unequivocally and said repeatedly, in fact, in that statement of policy, that unearned fees include the unilateral overcharges by a settlement provider that are in excess of the reasonable value of the services actually performed. Now, see, the question under Chevron's second step becomes, is that construction permissible? Is it a permissible construction of the law? And we have several criteria we look at to decide whether or not that is a permissible construction. Number one, does RESPA unambiguously forbid that construction? And that's the United States Supreme Court telling us. Does the statute at issue, does it unambiguously forbid that agency interpretation? And that's not the case here. Certainly HUD's interpretation falls beneath the overall intent of the RESPA statute. Is HUD's interpretation a reasonable one? And that is, there may be two, there may be three alternative interpretations of that statutory language. But that doesn't matter. Has the interpretation that HUD has come up with, is that by itself merely a reasonable one? Even if Your Honors were to believe that you could come up with a better interpretation of RESPA's language, is HUD's language by itself a reasonable interpretation? Number three, is HUD's interpretation consistent with Congress? Pardon me, Your Honor. I just wondered whether any other circuit has considered this issue. This precise issue, not that I can think of right at this moment. They look at overcharges, but well, let's go to, I think, to the Seventh Circuit where they, in the Echeverria case, where the Seventh Circuit held that because the settlement provider there did not keep the markup. And, again, and that's why I'm getting into semantics here. There was a markup. There was a title fee charged by the Cook County Recorder's Office, and then the defendant there, the defendant bank, took that title fee and marked it up to a much larger fee and then passed that fee on to the consumers. Here we have, we don't have a pure markup. What about Cruz, Second Circuit? Isn't that exactly this case? And I'm afraid the facts of that case are escaping me right now. But it seems like you're, what you want to turn this into is a price control statute, and I'm finding that to be a difficult stretch of what Congress could have intended here. I agree with Your Honor partially, and that is, of course, if we were trying to turn this into a price control statute, of course, Congress would not want that. What HUD has done, though, does not turn this into a price control statute. Now, remember, when Congress passed RESPA back in the early 70s, in the Senate and the House reports leading up to the passage of this bill, they repeatedly used terms like reasonable and unreasonable. We want homeowners to be looking at reasonable settlement charges. We want homeowners not to have to pay unreasonable settlement charges and unearned fees. Congress itself used the very language that HUD has used in its interpretive policy. Now, I want Your Honors to hearken back to the fact that at the time RESPA was enacted, Senator Proxmire introduced an amendment. And this is in the briefing, but I'm just going to touch upon it briefly. Senator Proxmire introduced an amendment that would have done exactly what Your Honor is speaking of. It would have set a monetary specific cap on the fees that could be charged of homeowners as part of the settlement process. And in rejecting that amendment and putting it to the Senate report, the legislators, the backers of this bill, said we are not taking, we do not need the Proxmire amendment because what is already within the statute is the ability to control overcharges, to control unearned fees, to make sure that these fees foisted upon homeowners are reasonable. The mechanism is already there within the statute. Well, I'm not a big legislative history person, I have to say, because I think that it's like sausage. And what they ultimately come up with, I think they're stuck with their language and the things that Senators and Congressmen say when they're doing things. They have their agendas. And so I think we're stuck with a language. I have to beg to differ with you slightly on that. Not all of us disagree. Well, the straight comments of legislators, of course, on the floor of Congress, but comments put into the conference reports accompanying the bill as it winds its way through Congress, as it comes out of committee, those statements are recorded, I believe, a certain degree of weight right below the clear text of the statute. And the language that I just spoke to you of, when the Senate kept on talking about the reasonableness of the fees, et cetera, the Senate bill was the one that was actually passed. So I think those statements ---- In effect, aren't you asking that we include within the language of the statute the words, the cost of? In other words, we interpret it as saying other than for the cost of services actually performed. That courts would determine the actual cost of services, and if those were exceeded in any way, that would be construed to be in violation of the statute. But, Judge Lynn, how can you look ---- the clear language of the statute speaks of forbidding unearned fees. How can you decide what an unearned fee is unless you look to the actual cost? That's where, regardless of what weight we give the legislative history, we're all trying to figure out what the intent of Congress was, whether through the language or looking at the history. And it doesn't seem to me that either in the language or the history, is there any indication that the problem that Congress was trying to solve is the problem that you say that they were trying to solve? Well, they talked about homeowners having to pay unreasonable settlement costs. I would suggest that $800 for a $20 computerized process is an unreasonable cost. Now, but Your Honors have pointed out, perhaps the statute is ambiguous at that point. It's ambiguous, but ---- and even though it doesn't use the word costs, all right, it's silent as to cost. Silence itself is a form of ambiguity. Silence itself, the Supreme Court says, allows you to move on to the second step of the Chevron analysis. This Court in the Schuetz case was dealing with yield spread premiums under RESPA. RESPA doesn't say a word about yield spread premiums. But that did not mean that this Court did not delve into the Chevron step two analysis of whether what HUD had to say about yield spread premiums should be deferred to. And it decided that it did. Where is the phrase, unearned fees, in the statute? It's in Section 8B. In the statute.  Pardon me. I'm sorry. Unearned fees. That's in HUD. That's not in the statute. So when I say to you, you're asking us to insert the cost of, and you come back to me and say, well, the statute prohibits unearned fees, that's the rub. The statute doesn't talk about unearned fees. It talks about fees for services actually performed. And actually, now I need to correct myself. It turns out I was right. It's the very title of the statute, Section 2607, Prohibition Against Kickbacks and Unearned Fees. Okay. But you're relying on Section B. Right. And Section A is the kickback section, Your Honor. Section A is specifically the kickback section. Section B is the unearned fees. Even though the term unearned fees does not appear in that section, I think when you read the language of that section, no person shall give and no person shall accept, et cetera, et cetera. B relates to splitting fees. B is entitled splitting charges, but then the text of the statute goes on to talk about, in the disjunctive, splitting fees, but also a portion or percentage of any charge. And that's what we have here. We have an overcharge. No, I've – well, okay. It says other than for services actually performed, which it seems to me means that what they're trying to get at is people who are getting fees for something that they didn't do, not that they may be getting more fees than someone might think is reasonable. I appreciate your point, Your Honor. But, again, I think that's sufficiently ambiguous that we look to HUD. And HUD says that other than for services actually performed by itself includes overcharges. That view is perfectly consistent with Congress's intent. And, you know, the – That would put the courts in a pretty big business, wouldn't it? You mean of having to decide what's reasonable and unreasonable? Yeah. But Congress also expects courts to look at what a settlement provider has done and see whether or not those services are actually performed. You know, I see I have about a minute 30 left. I'm going to save that for rebuttal, please. Thank you. May it please the Court. My name is Thomas Hefferon. I represent the defendants in the case. There was a mention, I think it was from Judge Lynn, of the Cruz case. And just for context, I think we covered this in the brief. The Cruz case was against my clients, the same defendants here, in the Second Circuit in Brooklyn. In the Eastern District of New York. That was the case that eventually on appeal established that an overcharge claim like this does not state a claim. On remand, Mr. and Mrs. Martinez attempted to intervene in that case before they filed this case. And the district court in that case said, you shouldn't be able to intervene here because your claim is just an overcharge claim. And under the Second Circuit authority, you're not going to get anywhere. So it's pointless. They then came and brought their case over to where they frankly should have filed it in the first place, in San Jose, where they live. And then here we are up again. The context, I don't think, is legally dispositive. Certainly not the way the issues are posed here. But it gives context. The Cruz case is exactly this case. It is obviously up for Your Honors to decide. And the Cruz case doesn't control anything. But the issues are exactly the same. The theories are the same. And we would suggest the disposition of the Second Circuit is precisely correct. You don't get to the HUD policy statement unless there's ambiguity. If you get to the HUD policy statement, would you concede that that's problematic? I would concede that people who are trying to invalidate a regulation or pronouncement who are in Step 2, which would be my clients, have a harder time than the proponent or the supporter of the regulatory pronouncement. That's the nature of the Chevron test. But we believe that even if the Court got to Step 2, that the Court still should affirm Judge White's decision here. We talked about this in the brief, but I'll review those issues. Because unlike the Cruz case, the Third Circuit, the Eleventh Circuit, and other circuits who had discussed Step 1 and never got past Step 1, which we think is right, there's been little commentary on what would happen if you got to Step 2. But there's been a little bit, and I think it's worthwhile to review, for the reasons why, if one got to Step 2, you still would not want to uphold HUD's pronouncements. Well, is it the Step 1, if you're saying that it's unambiguous, it's a little bit, it's almost by negative implication, though, correct, that you're saying that because they don't talk about it, they clearly didn't intend to include it? Help me out there. I think there's a point there. But, no, I think that what's unambiguous is something different, and that is, as Judge White pointed out, the question for the question is whether the complaint states a claim. In this case, the complaint on its face, paragraphs 15 and 33 of the Second Amended Complaint, alleged that the plaintiffs paid $800 for underwriting services which were provided by Wells Fargo. The question that Judge White faced and resolved in my client's favor is whether the statute is ambiguous in excluding the term other than for services performed or for services otherwise performed. And that the Court found it was not an – that's not an ambiguous phrase. The question is, were there services provided? Plaintiffs admitted there were. Was there a charge made for them? Plaintiffs admitted there were. And so, therefore, it was not ambiguous. You didn't – there was no ambiguity in that phrase, other than for services. And in the context of the case, therefore, that you don't get to – to HUD's pronouncement. So your position is that unearned in the title of the statute refers to the kickback portion only? No. My position is that the title of the statute refers to – the unearned part of the title of the statute refers to 8b, the kickback. It says a prohibition on kickbacks and unearned fees. 8a is kickback. 8b is unearned fees. 8c and d are. And your interpretation of unearned is you didn't do any work. Correct. Not you charged more for your work than reason would provide. Correct. Correct. And I think it's important that one aspect of the legislative history, which is very important, which is statutory, not Senate reports, although we think the Senate reports are quite supportive of our view, though we point out it's not a conference report, but – and there was a conference here. But the legislative history that is in the statute, which is very helpful in understanding what Section 8b means, is Section 12 of RESPA, the public law, which is 93-533. Section 12, Congress designated HUD to consult with a number of other agencies and within three to five years report back to Congress about whether – as to make recommendations on whether Federal regulation of the charges for settlement services is necessary and desirable, and if so, how it should be done. So we're not talking about reports. We're talking about actual Senate reports and whatnot. We're talking about Congress saying this is how far we're going to go, and then we're going to ask HUD to see if we have to go further. And what our position is is that plaintiffs are suggesting essentially that Congress didn't do that. They're suggesting that Congress decided, yes, there should be regulation of settlement charges, and it should be done through private litigation. And, in fact, Congress at the time, it enacted this very section, which has never been amended, Section 8b. It's never been amended. At that time, Congress actually decided, well, we're going to go so far, we're not going to go further yet. And Congress has never decided to go further. So the — there is another aspect of this about the issue of silence. That is, there's no ambiguity, as Judge White found in the phrase, other than for services. But also, plaintiffs contend that because the statute is silent, doesn't say that you can't regulate charges, then it's okay for HUD to say you should. Well, that's not the proper use of Chevron. When you're — when a question is arising under Chevron about statutory silence, it's when Congress has provided for something, but has been silent about how to implement it, or silent about what a particular term means. The classic Supreme Court case is the Barnhart case. Barnhart was a disability case. It was a question of duration. He had to be — he had to be disabled for 12 months. What did that actually mean? And what Judge Breyer said was Congress was silent about what that means, and that allowed the agency to provide a whole series of rules about how to calculate and what to look at and things like that. Here, Congress didn't provide anything at all saying that there shall be regulation of charges. It simply said that there shall be no splitting of charges other than for services. So this is not a silence case, except in the sense that there's no support whatsoever for the plaintiff's view. So you have no ambiguity on what the language is Congress enacted. And no silence. Well, why did HUD say that? What it said then? It seems like HUD thought it was maybe ambiguous and then made that statement. That HUD thought it was ambiguous? Yeah. HUD — well, a couple of observations. First, most of HUD's policy statement really addresses a somewhat different issue, which is the issue of whether it requires two people to be splitting the charge or whether a mere markup is a violation. And so to start with, HUD was really concerned with whether that was the primary — whether that was a violation. That's not an issue in this case. And HUD — HUD, of course, believed that it had the authority to interpret the statute and to provide its — its interpretation. But the question, of course, as to whether the statute's ambiguous is one for the courts. And the Second Circuit, the Third Circuit, the Eleventh Circuit, Judge White obviously below, Judge Ilston as well, and Margaret Ellis, I think. And even recently, Judge Fitzwater in the Northern District in a case called Hancock all concluded that statute was unambiguous. You don't get any further. When was the — when was the statute passed and when was the regulation issued? The statute was passed in the early 1970s. And there's an interesting — the Senate report actually talks about how there had been price regulation when President Nixon regulated wages and prices in 1971. And then that had gone by the boards. And Congress had not reenacted that. And that caused the question of, well, what do we do? And that was this statute in 72 or 74. Regulation followed, I believe, shortly thereafter, but I'd have to look at that. So this has been in effect for — this regime has been going for about 30 years? Yes, the statute. And RESPA causes a lot of litigation. But it is — it is, I think, clear, and nobody doubts it, that no court has yet upheld the 2001 policy statement on this issue. And that if it did, we would lead to price control, which would be — obviously an awful lot of — cause an awful lot of litigation. I wanted to touch just a little bit more on Judge Callahan's question about, well, what happens if we get to step two? We think HUD's — HUD's reading is not consistent with the statute, even if you got to — even if you got to step two. It's not one that Congress would have sanctioned. Again, why? Well, first of all, Section 12 of the enacted public law. Congress said, let's figure this out later. So for HUD to then step in and sort of take that over and decide to put in regulation of prices is inconsistent with what HUD had intended — I mean, Congress had intended since they had designated HUD to figure that out and report to Congress, not figure it out and implement something itself. So it would not be — even if you got to step two, it would be not consistent with what Congress would have intended. Furthermore, it would still be inconsistent with the law. There's no legal basis in the law for that. The other — there's two other points I'd want to make. First of all, this is a treble damages — automatic treble damages statute. It's not discretionary. If you violate the laws, it triples automatically. And it's a criminal liability statute. Congress, again, we would contend, in light of that structure, would not have intended that the regulatory agency could decide to put on an unreasonableness limitation on settlement service providers and to do so and have it enforced in sort of retroactively or retrospectively through private litigation because of the possibility of treble damages and even the possibility of criminal liability. I wanted to ask you a question about the UCL claims. Sure. If the plaintiffs are allowed to proceed in their State law UCL claims, in what specific ways would that impair Wells Fargo's ability to service mortgages? Okay. The question on UCL, again, is — we think was treated quite thoroughly by Judge White. The — what we have to remember here is this power that is at issue, which is the power to set the price for a loan, is at the very core of banking activity. Certainly, there's lots of things at the core of banking activity, but we're not talking about the ability to decide, you know, whether or not — you know, what to put on the front of your branches or anything like that. It is really right at the center of what you do, which is setting the price. And so the impairment that the UCL claim would provide, okay, is by looking at what the UCL claim is. UCL claim says it's unfair to charge more than your actual reasonable cost, presumably taking into account some profit margin, but a reasonable cost. So it would impair Wells Fargo because it would require — it would not permit Wells Fargo to exercise its fundamental banking power under Section 371 to make loans and the incidental power granted to it under Section 24 of 12 U.S. Code to do everything necessary to make loans, which obviously must include the pricing on the loan. And it would impair that because it would restrict the regulatory authority as well as the statutory authority to set the price. And Congress gave broad grants for this core activity, and the OCC specifically said that you can set those noninterference fees and charges in your discretion. And so it would constitute an interference. It would conflict because the OCC says you can set these in your discretion, but the UCL through litigation would say, except it can't be too high. That's a conflict, and so that's an impairment. It would be an impairment similar to a usury statute. Now, we're not dealing with usury because that's a separate section of the whole scheme, but it would be, you know, essentially saying to a bank, you can't charge this fee or that fee or you can't charge more. And so it's an impairment. It's significant. The fact that it's an impairment that arises from 17200, okay, rather than from a direct statute, doesn't matter. If you look at the recent Ninth Circuit cases, Rose is one, Silvas is another. Those are all 17200 UCL-type claims. You look at the effect of it. You don't look at whether it's a regular banking statute versus a nonbanking statute. And the effect of this really is to say, you know, for underwriting, you can't charge $800. You can charge whatever plaintiffs think it might be, and who knows what they think it might be, but let's say 20, 25, 30. That's a big impairment. That's a significant impairment. Under the regulation, we think this isn't a close case, and not only do we have the direct regulation on noninterest fees and charges, but we also have Section 34.4, and that regulation provides that loan terms are things that the bank must be allowed to set. It doesn't say must be allowed to set except unless it is not significantly impairing. It says it must be allowed to set. Again, it's a core banking activity. We're not talking about, you know, a zoning law or an issue that might really be on the outskirts of whether the State can interfere with the bank and things like that. We're talking about what the banks do. They make loans. And they make loans and they set prices on what it costs for those loans. That's what this UCL claim would be. The only way you win the UCL claims is for us to find preemption, correct? The answer is actually at this stage. Right. No, obviously. I was just thinking. The answer, yes, with respect to the unfairness and with respect to the fraudulent. You'll claim it's not. Correct. With respect to unlawfulness, the judge also found that it was not an unlawful violation because the assertion was that the settlement statement should have said the actual cost. Right. And instead, in fact, the regs and we cite them all as a charge. But, yes, I mean, that was the grounds on which we litigated. There were other issues, of course, we all could litigate. But we went ahead and essentially tried to litigate this case straight up on the major issues, which are well-trod in the cases, and we've obviously cited those to Your Honors. Unless there's any further questions, thank you for your time. Thank you. Mr. Daly. Thank you, Your Honors. A minute and a half left. I'll try to be brief. Judge Callahan, you anticipated what I was going to come up here and speak about on rebuttal, and that is the UCL claims. Even if this Court were to disagree with our position on RESPA, we still have the UCLA. Now, counsel said that that's preempted because Wells Fargo ability to set the price of a loan cannot be infringed upon. This has nothing to do with the price of a loan. This is an ancillary service. This is like charging $200 to FedEx the loan documents over to the notary's office when it only costs $18 to do it. This has nothing to do with the price of a loan. And the Office of the Comptroller of the Currency, all right, the banking equivalent of HUD, has told its member banks, has told the national banks, you are not exempt from various state laws that control unfair or deceptive acts. It told them that. And that's all the UCLA – and that's all the UCL is here. It's a state law that controls – that prohibits unfair, fraudulent, unlawful acts. Now, in fact, this Court said so in the Wells Fargo case as well, that the national banks can still be regulated by the states if doing so doesn't, quote, prevent or significantly interfere, end quote, with the bank's exercise of its powers. The bank has the power to set interest rates, to set the term of a loan, et cetera. The bank does not have the power under OCC regs to charge $800 for a $20 computing process. And I would submit to Your Honors that that is a paradigmatic example of the abuses that Congress was trying to outlaw back in the early 70s when it said that settlement costs for homeowners, for American homeowners, should be reasonable. If Your Honors have no further questions, thank you very much. Thank you. Thank you. The case just argued is submitted for decision.
judges: Lynn, Schroeder, Callahan